May it please the Court, Counsel. Brian King is my name. I'm here representing Stephanie C. I'm much more interested in responding to panel concerns than I am in just going through my own points, so I welcome any questions from the panel. I believe the parties briefly out their respective positions fairly clearly with regard to the first issue, the standard of review, whether that is de novo or clear error. Unless their questions, I'll leave the argument on that point to the Court. I do have some questions about it. You seem to indicate that the standard of review in the last analysis is a question of counsel's intent, and I'm really struggling with the argument that you make in that regard. Well, our point, Judge Selye, is that when you're talking about stipulated facts, that's different than when you're talking about a situation where the parties work together to stipulate a record. First of all, I don't think there's any material difference there. I think what is determinative here is that a record is compiled in the administrative proceedings. The parties have agreed that this case is to be decided based on that record. Am I correct so far? That's correct. That's the scope of review. So in that sense, the case is almost like an administrative law case. It is. We have said consistently in the administrative law format that motion for summary judgment has no place in that type of scenario. That it is simply a vehicle to get the administrative record before the Court so the Court can make a decision. The Court's not going to conduct a trial. Normally, you have a motion for summary judgment, and the Court decides a question of law. Do the facts taken in the light most favorable to the non-movement reflect the absence of any genuine issue of material fact and disclose that the movement is entitled to judgment as a matter of law? And if that question is answered yes, it's the end of the case, and if it's answered no, then there's a trial. In an administrative law case, or in this case, the question is different. The question is who wins, because the decision that's made on this record that happens to be presented in motions that the parties have labeled motions for summary judgment is going to be determinative. So I think that the scope of appellate review depends in that respect on what the nature of the district court's review is. If the district court does abuse of discretion review, then the district court is really answering what amounts to a question of law. Did the plan administrator abuse its discretion? And I would think we would review that de novo. But if the district court is entitled to do differential fact finding, I've got this record in front of me, and I think that this fact is more significant than that fact, then I would think that that would call for some form of deferential review, clear error review, on appeal. Now, what's wrong with that as a method of approach analytically to this sort of problem? I would submit to you, Judge Celia, that the district court is in the same position as the court of appeals. Namely, reviewing the pre-litigation appeal record, the claim and appeal record, to determine whether it depends on the language of the plan document as to whether it's abuse of discretion or not. I agree with you entirely, Mr. King, except that we have a litany of cases that say the fact that the district court rules, the fact finder rules, based on an entirely paper record is not a reason to deviate from clear error review, that when the fact finder rules on a paper record, we treat it like a bench trial. And we've got case after case that says that. I would submit, Your Honor, that in the ERISA context, it's not clear at all. And I'm not aware... We don't have an ERISA case on it. The closest we've got is SULIS. But we don't really have any clear law on it. That's why I'm struggling with this. And I appreciate your help on it, because you're obviously knowledgeable in this area. Well, I litigate a lot in this area and have for many years across the country. I'm not aware of any case law. Now, I haven't looked into it in the kind of detail that we've been talking about right now, Judge Celia, but I'm not aware of any case law that says that court of appeals treats a district court review of the pre-litigation appeal record in an ERISA benefits claim with deference. Isn't SULIS that sort of case? I don't recall... I don't think so. I mean, we applied... SULIS is an ERISA case, and we applied clear error review to a case where there was no independent... ERISA cases, conceivably, can have independent evidence offered at the district court level. That wasn't true in SULIS, and it's not true here. Since it's not true here, does this matter here? I mean, I'm not saying it doesn't matter ever, but here, is there any fact-finding that this differential could affect one way or the other? I don't believe so, Judge Barron. I think that what we're talking about is a fairly run-of-the-mill review of the pre-litigation appeal record by the district court to determine, in this case, on remand from this court, whether under a de novo standard, the decision made by Blue Cross was right or wrong. And is that because what we're really doing is just interpreting terms of the policy and the plan? Yes. And that's just going to... that's not going to be a clear error under any formulation? Right. I don't think that the inquiry that this panel is engaged in is any different than the inquiry or the process that the district court was engaged in on remand under a de novo standard. And I just... and since the plan doesn't get any deference, given our prior decision... Right. ...we review its review of its own policy terms de novo. That's our position. And as far as what other wrinkles there may be to how to do standard review in this setting, this case doesn't present them. I agree with that. In Gross, for example, you had a lot of information presented to the district court to determine whether the facts justified saying that this was a plan that fell under arrest or not. And that's one where there was a clear error standard of review, or a discussion of whether that was the appropriate standard of review from the court of appeals. So... and I think Solis is the same way, in the sense that there was a degree to which the district court engaged in some independent fact-finding. So, Mr. King, so you have here psychiatrists whose statements are in the record, who take different views as to different things, and the district court chooses which view to give more weight to. That isn't fact-finding? No, I don't think so for this reason, Your Honor. Our position is that if the psychiatrists who are supporting the position of Blue Cross want to provide their opinion based on information in the record that justifies it from the position of a de novo review, the district court's perspective, that's different than the district court actually going through and saying, I'm making a credibility determination as to who, which professional to place more weight on. Now, we do have the argument, of course, Judge Selya, that we presented, and I think it's a valid argument to say that there should be greater deference accorded psychiatrists, particularly, who have had an opportunity to examine a patient than those who are just doing a record review. But that's a different issue than what you're talking about, I think. That's more of a... as a tie-breaker when there's a question about, in all situations, who's got greater credibility, an examining psychiatrist or an individual who's just reviewing a paper file. May I ask you a question which I think would not, excuse me, would not turn one way or the other on the standard of review. One of the defenses that they make is that you're not entitled to the coverage in dispute because the individual was not admitted to this particular facility within 24 hours of the discharge from a psychiatric hospital. Right. You answer that in the reply brief, as I understand it, by saying, that does not matter because there is no question that this particular facility is a PRTC, a psychiatric residential treatment center. Correct. My question, number one, I'm not sure that I follow the argument. I don't see how one follows from the other. But that will be my first question. My second question is, let's assume that this, in fact, is a PRTC. Don't we have to construe the criteria being used in connection with the plan that's using it? I mean, the two have to be read together. And the plan that, in fact, is using this criteria is a plan that expressly includes treatment in an educational facility. Therefore, don't we have to construe the meaning of PRTC in this case, under this policy, as excluding from the definition the very institution that he is in? Why don't you lose on, so that's my second question, why don't you lose on that basis? If I may, Your Honor, just as soon as my time has elapsed, but I would, I do want to respond to that question. What we've got here is a contradiction in terms to some extent. My first argument, Justice Souter, in response to that is, you can't raise in litigation for the first time a basis to exclude that hasn't been raised before. No, but my, the reason I ask the second question is, it's true. They did not, in writing, under But don't we have to construe the meaning of PRTC here as excluding this kind of facility? What they did say in turning down coverage was, you don't meet the, what is it, the qualic, I want to say qualic home, inter-qual, inter-qual facilities, and so we have to know what the inter-qual criteria mean, and construing the inter-qual criteria under a plan that says no residential educational facilities, don't we have to, regardless of whether they use that as an independent basis or not, don't we have to say a PRTC for, under this plan, cannot include the educational facility? I would say no for this reason, Justice Souter. You've got to read the terms of the plan together with the criteria from inter-qual, and the inter-qual criteria specifically require, if you look on page 192 of the record, and we cite this, it's in footnote 21 in the briefing, the inter-qual criteria specifically requires that with regard to PRTCs, there has to be a school and vocational component, and the reason for that is, the great majority of adolescents who are in a school setting, if they were behaving at a level that was a greater functionality, so to take them out of the school in order to give them mental health or emotional health or substance abuse treatment would be very detrimental to their well-being. You have to build into the treatment, an inpatient setting, an educational component. I think what you've said shows the conflict between the criteria and the plan. There's a little bit of conflict, or at least tension. I think it can be reconciled. We ignore the plan in favor of the criteria. I think it can be reconciled in this way, Justice Souter. When you're talking about treatment that is primarily provided in an educational setting, that's what the language of the exclusion is talking about. When you're talking about primarily treatment that's provided with incidental educational, an educational component that's incidental to the primary reason for the individual being in the setting, which is, again, a partial residential treatment center, then it's okay. So I think that there's room to reconcile this in a way that is in the best interest of the patients, is in the best interest of Blue Cross. I don't begrudge Blue Cross saying, look, we're not going to cover care that's provided as an incident to an educational setting, what is first and foremost an educational setting. So I'm out of time, unless there are other questions. I'm happy to offer a couple of my own. I have a question which only tangentially relates to Justice Souter's question. I looked in the district court record in an attempt to find where you objected to the educational setting defense on the ground that that defense had not been presented in writing. I couldn't find it. The district court ruled against you on that point, but didn't discuss the in writing point. What the district court discussed was the notification by telephone call and the admission in the complaint that that notification had been made, et cetera, but not the in writing point. If you would, and without holding everybody up, perhaps within five days from now if you could by letter point out where in the district court record you preserved the in writing element of what you are now saying is the educational setting defense, it would be helpful to me. Thank you, Justice Souter. I'm happy to do that. I think before you sit down, two questions. One on the question Justice Souter was posing to you. Am I right that the reason given, what was the reason given with respect to the PRTC issue? Was it purely the 24 hours? The reason given, you're talking about the denial clause? Yeah, no communication on that. What they said is, one of the things, and we argued this in the last case that we had before you, one of the things we were frustrated about is the fact that there wasn't a lot of detail given as to why this was not covered. We discerned and we responded in the litigation appeal process of claims and appeals to the idea that what La Crosse was saying is this treatment is not medically necessary. And so we talked about it is medically necessary for this reason, that reason, and the other reason, talked a lot about MG's medical history, that kind of thing. So there wasn't the question that I recall, and I haven't looked, I have to tell you Judge Byron, I haven't looked through in preparation for our hearing today, all in detail those appeal and denial letters. Maybe just a simple way to ask it is if as to the first ground, the educational setting, where you say I didn't get notice of that because it wasn't in writing. Right. And so the medical necessity, you say I did get notice of that in writing, but they're wrong. That's right. Okay. The third one is this 24-hour. What status is that in? Is that something you're saying I didn't get notice of? Or is that something I did get notice of and they're wrong? Why is that in the case? I don't get it. Well, that's a great, that's a good question. I don't think we did get fair notice of that. It was something that came up in the writing. Well, I guess that's not so much what you're saying. Like what did you have, do you, what is the arguments that were presented with respect to that issue? Is that, did you raise an objection that you were not notified of that as being a ground? To the best of my recollection, that was an argument that was first raised before the district court. And we did not say this is a new and different argument. I think that what we did in the district court is we treated it as a component of a more fleshed out argument about medical necessity and about whether the criteria was satisfied. I'm happy to deal with it. So in that sense then, one way to think about that is that's not really a ground. It's just part of the medical necessity issue. So let me just ask on the medical necessity, is the ground that was given, I thought the ground given for rejecting the medical necessity was this idea that there had been improvement. That was part of the ground. That was one of several grounds. Yeah, there were. So, I mean, I just, I'm trying to figure out how much one would have to get through. Well, this is the frustrating thing. This is the frustrating thing because what happens is in this case, what happens often in these cases is you have relatively cursory bases for denial provided by insurance companies and these EOBs, the EOBs, and there was a reference in the briefing to claims listing. Those are just references to what the explanations of benefits that were sent to the family at the time said. Those explanations of benefits are almost always quite cursory. And then there are follow-up communications in the form of telephone calls or letters that are exchanged between the families and the insurance company. And what happened here is we still got relatively, a little more fleshed out, but relatively cursory reasons for the denial. Namely, we don't think it's medically necessary. And the family tries to flesh that out in their response, in their appeal. And then when we get into litigation, under this rubric of medical necessity, what I see commonly is really fleshed out arguments as to how and why medical necessity is not set. So the reason you're focusing on the 24 hours is that would show it was medically necessary. That's one way of understanding what they said. Obviously, if you had just been in a psychiatric 24-hour release, there might be a case that this was medically necessary. They're saying, no, that didn't happen. Therefore, this can't be medically necessary. So you want to consider it in that rubric, which is why you focus on that dimension of it. Right. Okay, last thing. Tying back to Justice Souter's point, that requires that you adopt Blue Cross's argument that there's no coverage available for PRTCs. And we reject that. We contest that argument. So last thing, just on the improvement issue. Can you just help me understand how to think about that? Clearly, the treatment from Aspiro improved the condition of your mind. That's right. It just did. It did, no question. Clearly, no one, I think, would think it improved it in any way that one would be satisfied with. That's right. Which is why Aspiro says at the end, we recommend you go to this facility. Exactly. Okay. The language of the plan of the policy seems to refer just to improvement. That's all it does. Well, what are we supposed to do with that? I don't quite understand it. If you look at the more detailed criteria that's outlined in the interqual, that's going to give you information that says, even though there has been improvement, if you still have risk in the form of unsuccessful treatment, and you still have a support system that's unavailable, or you're unable to manage the intensity of the symptoms, then it's appropriate to say the RTC level of care is proper. Because even though there's been an improvement, there's still, as you say... Why do I care about the interqual as an aid to interpreting the word improvement in the plan or policy? Because the plan itself says we are, and Blue Cross doesn't contest this, it's in their brief today, that interqual is the gold standard for fleshing out more general language about medical necessity in the plan. So the language of the plan says what it says, but it's not complete for purposes of evaluating the specifics of each particular case. And Blue Cross acknowledges that. They use the interqual criteria and they refer to it. Thank you. Thank you. Needless to say, we went over someone on the side, so we'll be equivalently generous if it's appropriate. I'm more than happy to answer any questions the court has. I have very planned a brief argument. There's still plenty of time for questions. What I would like to do with the indulgence of the court is reply to the arguments made in the reply brief. Those arguments were never presented to the district court. Neither of the specific ones that basically the argument comes and reduced to the two specific arguments that I will address, or the general point that Judge Sellier raised was not made to the district court. They were made for the first time. They weren't made in brief and principle. They were made for the first time in the reply brief. And we haven't had a chance to address them in writing. So there is a broad framework here is that the plaintiff claims entitlement to benefits under ERISA plan and has to prove, has the burden of showing that entitlement. Within that framework, there have been two general things discussed by the parties. One is the requirement of showing medical necessity, and the other is the educational setting provision in the policy, which says that psychiatric treatment provided in conjunction with or in an educational setting is not covered. It isn't a question of PRTC. Specifically, it's more generally anywhere that you have someone who is getting treatment within an educational setting that is not covered. It was written, that provision was written to exclude specifically these kinds of Utah plans where somebody goes for 20 months to an educational facility and is given 20 months of treatment while also going to school at the same time. It also covers ranch programs and things like that. Does it cover non-residential settings? Does it cover non-residential settings? If it's an N, yes, it covers school settings. If you get it, yes. Does that maybe suggest a reason to think that you could square the PRTC language and the educational exclusion? In other words, that there would be a reason to have a bar on educational settings that would be like not necessarily apply to residential psychiatric treatment centers that also provide some education? That may be, Your Honor, I haven't fully thought that out, but the plan specifically says it doesn't cover PRTCs. He does raise the point, if you have adolescents who are going to residential treatment centers for any period of time, it seems odd that there would be a requirement that such places could not educate the children while they're there. It may be odd, but it's sort of which concerns the little guy to the horse. The idea is that if you have treatment provided in conjunction with an educational setting, the plan doesn't say if it's 50%, 20%, whatever, it's just a blanket. We don't cover that. And it's been clear, and it's been clear for 10, 15 years when we wrote this provision in, specifically to deal with these kinds of Utah plans. There are two issues that are addressed in the reply brief that I'd like to come up with. One is this invention of a phantom provider who provided treatment to Miles while he was at Gateway, but somehow was not a Gateway provider, so that the specific EOB that says we don't cover educational settings was not addressed to someone at Gateway. And the other is this idea that somehow the inter-qual guidelines trump the plan and override the provisions of the ERISA plan. Let's talk about your first point. I understand what you mean. The psychiatrist who received that EOB was a consultant who did work at Gateway. But I think that the point that the appellant is making is that that is the only EOB which specifically relied on this educational setting language. All of the other explanations of the denials addressed to other charges, apart from the consultation fee of that one psychiatrist, did not refer to that particular code. That, in conjunction with two other written EOBs, one of which is in footnote 2 of our brief, says that services are not covered because this is provided by a non-covered provider, and another one that says that benefits are not available because the service is not covered when performed at this location. Beyond that, it is very clear that the very first thing that was said to the family in this case is we paid some claims you sent in because we didn't understand that they were being provided in conjunction with an educational setting. That was a mistake. Absolutely clearly, we don't cover things provided in a school setting. We won't do it from now on. We won't take this money back. But from now on, they're your responsibility. The practical purpose of the reason why claims like that are excluded if raised for the first time in litigation is sandbagging somebody. They don't understand clearly what the issue is. Excuse me, what Mr. King says about, he concedes that that telephone conversation took place, but he says now, I'm not saying he said this in the district court, but he says now that a whistle requires that that explanation have been in writing. Again, I return to the practical purpose. Practical purposes aside, it seems to me that's a legal question. Does a whistle make that requirement? I can understand the court arriving at that conclusion, but to understand the slope of which we're going down now, it's one thing to say someone doesn't understand it all. Then it's the next thing to say, okay, they have to understand it in writing. It's the third thing to say, it is in writing, but it's just one EOB.  It is an EOB addressed to a psychiatrist. We can show that the out-of-state psychiatrist provision is exactly the way they address, identify claims by psychiatrists at Gateway. If you look at page 235 of the administrative record, it shows that on the first week when Miles was at Gateway, he was given an initial evaluation by the psychiatrist at Gateway, whose name is Dr. Weintraub. But the EOB on pages 156, excuse me, the bill submitted by the plaintiffs on pages 156 and 157 of the administrative record show billing for that precise event. And the EOB on page, I believe it's 141, the fourth entry down, shows that that bill was paid, because they didn't know at the time what was going on, and that bill was paid, and it's identified as treatment by an out-of-state psychiatrist. I thought the ERISA written notice requirement was written notice to the participant or beneficiary. This was sent to, this is an EOB sent to Miles' family, not to Gateway. And it also is not to, not to Gateway. This is a subscriber-submit bill, and you can see that on an administrative record on page 156. A subscriber-submit bill for Dr. Weintraub's treatment of Miles at Gateway, and it's identified on the EOB as an out-of-state psychiatrist. This is how those, the individual providers at Gateway were identified on the EOBs. The names of the individual providers is never included in those EOBs for people at Gateway. But the fact is, I don't see how that satisfies the ERISA regulation, which in effect says you did not raise the question of residential, of educational facility. The ERISA, as I understand it, the ERISA regulation requires that the reasons given be at least comprehensible to lay people receiving them. And no one, based on what you have just described in that EOB, would be able to infer that what you are really saying is, it is the residential character of the facility which precludes coverage. It's not the residential character of the facility. Education, I'm sorry. Education, it does. It's the EOB says we don't pay for claims for treatment provided in a school setting. It says that in the EOB. Yes. In the EOB, it's message three and writing. Yes. Oh, OK. Where is that? That's at the administrative record 156, you said? That particular one, I think, is in our brief. I think I believe it's one. One thirty six one in the one thirty one forty. But it's definitely in our brief. I don't have the pages. I believe it's page one thirty eight one one forty in that area. It's message three and message eight on EOB for treatment in November of 2011. As I recall, as I recall it, I'm sorry to recall the page at the moment. The other part of this is the notion that somehow intercourse trumps the plan. Obviously, they can't trump the plan. And what this comes down to in the reply brief is an argument that footnote twenty one in the in the Interpol plan talks about whether PRTC has to be in such and such a form. And since it depends on organizational policy and part plaintiff argues that, well, that's referring to EOB and to PRTC organizational policy. But saying the statement appears on page one eighty nine in the introduction to the Interpol criteria and the introductory instructions. If you look at page one eighty nine, it says the same thing. And it says that in every one of the instructions, it says that all of the Interpol criteria are subject to inter to organizational policy. Interpol itself says it's not. It is a guideline and nearly a guideline. I see my time is up, but obviously I would be glad to answer any questions for the court. I have just two. One is. Are you. What is your response to the contention that if they didn't get notice in writing of the ground for denial being the educational nature of the treatment center, that the reference to the twenty four hour point can only be understood as an argument about medical necessity to separate issues? Well, I know they are platonically two separate issues, but in the context of this case in which the ground given was educational setting or medical necessity. And we say they didn't give notice. Is there a contention of medical necessity? The only ground given would then be medical necessity. Right. How does the point about the twenty four hours relate to anything other than medical necessity? I'm not following. It doesn't. It is a pure medical necessity provision. What we said about medical necessity to the plaintiffs and to the plaintiff's family is this. This is denied because it does not meet interqual criteria for residential treatment in the areas of symptoms and behavior. Yeah. But then that's not interqual trumping the plan. That's just construing interqual. That's right. OK. So with respect to that, it is the interpretation of the medical necessity language. OK, great. So then second point is interqual also something that we should use to interpret improvement under the plan. Yes, it doesn't say improvement. What does it say? It says one of the things that you have to show is a record of unsuccessful treatment in the previous six months. And there's a footnote that defines unsuccessful treatments as unsuccessful treatment is inability to finish a program. Period. Period. There's another part to it, but it's essentially the same thing. It doesn't say anything about improvement. And what Judge Casper said is he finished the Asper program. Not only did he finish the Asper program, he improved on the Asper program. So there is no way that he hadn't improved at all. And you don't cure these. Nobody gets cured on six months of treatment or whatever. These are lifelong problems. A successful program is not one that all of a sudden you no longer are schizophrenic. A successful program is one that you're able to prove to complete and make steps. And that's what happened in this case. There are no further questions. I thank the court.